IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| HUSSEY COPPER, LTD., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| ROYAL INSURANCE COMPANY OF AMERICA, | ) | Lead Case at Civil Action No. 07-758 |
| | ) | |
| | ) | Judge Flowers Conti |
| Defendant. | ) | Magistrate Judge Caiazza |
| | ) | |
| | ) | |
| FEDERAL INSURANCE COMPANY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| HUSSEY COPPER, LTD., | ) | |
| | ) | |
| Defendant. | ) | |

**MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION**

**I. RECOMMENDATION**

It is respectfully recommended that the parties' cross-Motions for summary judgment (Docs. 15, 17, 19 and 23) be granted in part, denied in part, and denied in part without prejudice, as described below. It is also recommended that Hussey's Motion to Amend its Complaint against Royal (Doc. 14) be denied as futile.

## II. REPORT

**BACKGROUND**

These consolidated actions, brought under diversity jurisdiction, involve Hussey Copper, Ltd.'s ("Hussey's" or "the Insured's") demands for coverage under commercial general liability ("CGL") policies issued by Royal Insurance Company of America ("Royal") and Federal Insurance Company ("Federal") (collectively "the Insurers"). *See generally* Royal's Facts (Doc. 15) at ¶ 1 (citing policies covering Aug. 1994 until Aug. 1996); Federal's Facts (Doc. 17-4) at ¶ 19 (policies covering August 1998 until 2004).[1] Hussey claims the Insurers owe a duty of defense in two Illinois state court proceedings, filed in September 2003 and October 2005 respectively. *See generally* Federal's Facts at ¶¶ 7, 8, 12.

In the first suit, the Kane County Public Building Commission ("the PBC") has brought claims against Hussey based on its supply of lead coated copper roof panels used in the construction of the County's Judicial Center. *See generally* 2d Am. Compl. in Kane County Public Building Commission v. Hussey Copper, *et al.*, Gen. No. 03 LK 475 (16th Jud. Cir. 2003) (filed under Doc. 14-4) ("the Kane suit"). The PBC alleges that, after installation in 1992 and over a period of time, Hussey's roofing material deteriorated and discharged lead and copper into a pond used by the Judicial Center ("the Pond"). *See id.* at ¶¶ 120, 123; *see also generally id.* at ¶ 135 ("[r]ainwater from the . . . Center is collected in an internal storm water collection system and discharged into . . . the Pond . . . via a discharge inlet, and thereafter into the waters of [the] County"). The plaintiff learned of the contamination through testing conducted in

---

[1] The parties' Statements of Fact are relied upon only to the extent they are not meaningfully disputed. The referenced Statements also provide appropriate citations to the record.

May 2003, and it notified the Illinois Environmental Protection Agency ("the Illinois EPA") as required by law. *See id.* at ¶¶ 123, 140. The Illinois EPA has since made the PBC conduct an environmental investigation and remediation. *See id.* at ¶ 141.

The Kane suit identifies two types of damages: those "arising from the repair and replacement of the Judicial Center [r]oof"; and "property damage for the contamination of the . . . [P]ond caused by lead leaching . . . and collecting" therein, including the costs of cleanup. *Id.* at ¶ 130. Although the Pond-related claims focus primarily on remediation, the pleadings make independent reference to harms preceding and/or unrelated thereto. *See, e.g., id.* at ¶ 144 ("the Pond has been damaged, the use of the Pond has been impaired, and drainage from the Pond has threatened soils and groundwater beneath and down-gradient from the Pond, as well as streams fed by the Pond both on and off property owned by [the p]laintiff"); *compare also id.* at ¶ 301 ("[i]n this Count against Hussey . . ., [the p]laintiff seeks damages only for the [P]ond abatement and remediation") *with id.* at same Count's "Wherefore" clause (requesting in alternative that Hussey "compensate [the PBC] for the damages to and expense of the property damage arising from the contamination of the Pond"); *cf. also id.* at ¶ 164 ("[a]s part of the damage to property, the fish in the pond have been or will be killed") *and, e.g., id.* at ¶ 300 (stating fish kill averment against Hussey through incorporation by reference).

The second suit has been brought by the Kane County State's Attorney, on behalf of the people of Illinois. *See generally* 1st Am. Compl. in The People of Illinois v. Hussey Copper, et al., No. 05 CHK 1410 (16th Jud. Cir. 2005) (filed under Doc. 17-7) ("the Peoples suit"). The action charges Hussey with violations of the Illinois Environmental Protection Act, and it asks the Insured to bear the costs of remediation. *See generally id.* at Counts I-II.

As to the Kane suit, Hussey disclaims its right to coverage regarding the repair and replacement of the Judicial Center's roof. *See* Hussey's Br. in Opp'n to Royal's Mot. for Summ. J. (Doc. 21, hereafter cited as same) at 4 (subject policies "do not provide coverage for the replacement of Hussey's own product"). The Insured also concedes it is not entitled to the penalties, fees, and costs sought in the Peoples suit. *See id.* at 4-5. According to its counsel, then, the coverage Hussey seeks in both actions is the same: "damages for property damage to the soil, groundwater and [P]ond sustained by the [PBC]." *See* Hussey's Cross-Mot. for Summ. J. against Royal (Doc. 19) at ¶ 8.

Shortly after the lawsuits involving Royal and Federal were consolidated, the parties participated in a case management conference. The Insurers' counsel suggested, and Hussey's counsel did not resist, expediting the adjudication of the policies' pollution exclusion clauses. *See generally* text-Order dated Dec. 17, 2007. The undersigned set a briefing schedule and stated that, should the exclusions not resolve the litigation, the court would set a discovery deadline regarding the remainder of the case. *Id.*

The parties have briefed the pollution exclusion issues, and their summary judgment Motions are ripe for adjudication.

## ANALYSIS

There are three sets of policy provisions in question. First are the "absolute" pollution exclusions applicable during the entire term of coverage for Royal and, for Federal, from August 1998 until August 2002. *See generally* Royal's Facts at ¶ 30; Federal's Facts at ¶ 20. Next are the "personal injury" provisions of Royal's policy, raised within the context of Hussey's Motion for Leave to Amend. *See generally* Hussey's Mot. (Doc. 14) at ¶ 3. Last are the terms

added to Federal's pollution exclusion for the coverage period of August 2002 until August 2004. *See generally* Federal's Facts at ¶ 22. Each type of provision will be addressed separately below.

### A. Royal's and Federal's Unmodified Pollution Exclusions

The Insurers' pollution exclusions are materially identical, and they state in relevant part:

> This insurance does not apply to . . . [a]ny loss, cost or expense arising out of any:
>
> (a) Request, demand, or order that any insured or others test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of pollutants; or
>
> (b) Claim or suit by or on behalf of a governmental authority for damages because of testing for, monitoring, cleaning up, removing, containing, treating, detoxifying or neutralizing, or in any way responding to, or assessing the effects of pollutants.
>
> Pollutants mean any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste. . . .

*See* Royal's Policy (filed under Doc. 15-6) at ¶ 2(f)(2); *see also* Federal's Facts at ¶ 20 (quoting materially identical provisions).

These provisions, commonly known the "absolute" pollution exclusion, bar Hussey's claims for coverage under the relevant policies.

Although technically only persuasive authority, the decision in Coal Heat, Inc. v. U.S. Fidelity & Guaranty Company provides a good summary of Pennsylvania law[2]:

---

[2] The parties are in agreement that Pennsylvania law controls.

> The language of the [absolute] Pollution Exclusion is unambiguous and therefore must be analyzed in accord with its plain meaning. . . . Numerous courts, both in Pennsylvania and elsewhere . . ., have found the [same] . . . .
>
> [U]nder Pennsylvania law, the plain language . . . of the [p]ollution [e]xclusion [is] interpreted broadly to excuse . . . indemnif[ication] for any damages resulting from the discharge of [pollutants]. . . . Pennsylvania courts have interpreted this [p]ollution [e]xclusion broadly, finding that [t]here is no coverage for claims . . . based on the escape of pollutants, and this is so irrespective of the role . . . the insured is alleged to have played in the pollution. . . . [As the courts have held, the] pollution exclusion is just what it purports to be -- absolute. . . .
>
> [Accordingly], . . . all of the damages claimed by . . . [third parties], from their cleanup costs to their alleged diminution in property values, were caused by the release of [pollutants] onto their land, and . . . Pennsylvania law requires that we apply the plain meaning of the . . . [p]ollution [e]xclusion [and] conclude that such language excuses [the insurer] from either indemnifying or defending . . . .

*Id.*, 2000 WL 1689713, *6-7 (E.D. Pa. Nov. 2, 2000) (numerous citations and internal quotations omitted, some alterations in original).

Hussey's counsel argues, without citation to legal authority, that certain terms of the pollution exclusion are ambiguous, and the provisions were "not intended to apply to the type of third-party 'damages' caused by the insured's products after that product has been sold or put to use." *See, e.g.,* Doc. 21 at 17-21. These interpretations are supported by neither the policy language nor the law, and the "absolute" pollution exclusion precludes coverage for the reasons stated in Coal Heat and the cited sources therein, which are incorporated by reference here.

B.     **Royal's "Personal Injury" Coverage**

As noted by Hussey, the Royal policies' definition of "personal injury" includes "[t]he wrongful eviction from, wrongful entry into, or invasion of the right of private occupancy of a room, dwelling or premises that a person occupies by or on behalf of its owner, landlord or lessor." *See* Doc. 21 at 7 (quoting policy language). Counsel argues that, because Royal's pollution exclusion applies only to the defined terms "bodily injury" and "property damage," its provisions do not apply to the underlying actions' claims for nuisance, trespass, and the like. *See id.* at 6-8.

Again, these arguments are contrary to the great weight of Pennsylvania law and other jurisdictions. As explained in the seminal decision O'Brien Energy Systems, Inc. v. American Employers' Insurance Company:

> [The insurers'] policies provide comprehensive general liability coverage for property damage which, were it not for its specific pollution exclusion, would clearly cover [the insured's] claim. Under the circumstances, to extend the personal injury coverage to occurrences [that] fall squarely within the property damage coverage would have the effect of rendering the pollution exclusion meaningless. . . .
>
> The personal injury [provisions] extend[] liability . . . to the specific torts there enumerated. It affords coverage only for defined risks. These include torts of a recognized type involving damages which can be lumped under the descriptive term 'personal injury.' The coverage does not provide indemnification for environmental damage claims based on migrating [pollution]. Coverage for such claims is specifically excluded by the pollution exclusion.
>
> To hold otherwise would emasculate the clear and unambiguous provisions of the pollution exclusion and could not be justified except as an unwarranted straining to reach a result different than that intended by the parties.

*Id.*, 629 A.2d 957, 964 (Pa. Super. 1993) (citations and some internal quotations omitted, some alterations in original); *accord* <u>Wagner v. Erie Ins. Co.</u>, 801 A.2d 1226, 1234 (Pa. Super. 2002) ("In *O'Brien*, [we] held that an absolute pollution exclusion clause applied equally to claims of personal injury caused by a wrongful entry or eviction."), *aff'd*, 847 A.2d 1274 (Pa. 2004).

Although Hussey cites the contrary decisions of two Pennsylvania federal district courts,[3] those cases preceded the decision in *O'Brien* and therefore are unpersuasive. *Cf.* <u>Sherwin-Williams Co. v. Travelers Cas. & Sur. Co.</u>, 2003 WL 22671621, *5 (Ohio App. Nov. 13, 2003) (rejecting reasoning in <u>Gould</u> and <u>NAPCO</u> because "the[se] federal court opinions were not [followed] by . . . the Pennsylvania Superior Court" in *O'Brien*).

Finally, the District Court should decline Hussey's request to override the decisions in *O'Brien* and its progeny. *Compare* Doc. 21 at 17 (arguing *O'Brien* was wrongly decided and not an accurate prediction of Pennsylvania Supreme Court law) *with* <u>Jewelcor Inc. v. Karfunkel</u>, 517 F.3d 672, 676 n.4 (3d Cir. 2008) (citations and internal quotations omitted) ("[a]lthough not dispositive, decisions of state intermediate appellate courts should be accorded significant weight in the absence of an indication that the highest state court would rule otherwise," and "<u>[t]his standard places a significant constraint on [the federal courts]</u>") (citations omitted, emphasis added); *cf. also* citation to <u>Wagner</u>, *supra* (citing Pennsylvania Supreme Court's summary affirmance of Superior Court's decision applying *O'Brien*).

---

[3] *See* Doc. 21 at 9-11 (citing <u>Gould Inc. v. Arkwright Mut. Ins. Co.</u>, 829 F. Supp. 722 (M.D. Pa. 1993) *and* <u>NAPCO, Inc. v. Fireman's Fund Ins. Co.</u>, 1991 WL 734015 (W.D. Pa. May 22, 1991)).

The "personal injury" provisions in Royal's policies do not create an end-run around the absolute pollution exclusion, and there is no coverage.

### C. Federal's Modified Pollution Exclusion

Beginning in August 2002, Federal's policy language was expanded as follows:

> [The pollution exclusion referenced above] does not apply to liability for damages, for property damage, <u>that the insured would have in the absence of such request, demand, order or regulatory or statutory requirement, or such claim or proceeding by or on behalf of a governmental authority</u>.

Federal's Facts at ¶ 22 (emphasis added).

Very little reported case law addresses this new provision, so the parties' briefing reaches it essentially in a vacuum. The Insured cites an article, drafted by a non-lawyer, risk management and insurance advisory consultant, claiming the language "removes from the scope of [the exclusion] liability for . . . third-party damage" in "cases such as Hussey's." *See* Hussey's Br. in Opp'n to Federal's Mot. for Summ. J. (Doc. 25, hereafter cited as same) at 8-9; *see also* C. Stanovich, *The CGL Policy Exclusion* (International Risk Management, Inc. Expert Commentary, Mar. 2003) ("the *Stanovich* article") at 8; website at http://www.irmi.com/ EXPERT/authors/ Stanovich.aspx (summarizing author's qualifications).[4]

---

[4] In the undersigned's view, the implications of Mr. Stanovich's opinions are far less certain than Hussey suggests. The author ultimately concluded:

> As a practical matter, due to the expansive nature of environmental laws and regulations, a vast majority of liability for cleanup costs will be imposed on an insured because of such laws or regulations. This puts insurers in the awkward position of determining whether or not the insured -- who may be clearly liable due to statute or regulation -- would be liable if the statute or regulation didn't exist.

-9-

On the other hand, Federal turns to the underlying litigation for its proposed interpretation:

> The additional language of the . . . pollution exclusion distinguishes between loss, cost, and expense arising out of a required cleanup, versus property damage that would exist absent a request, demand, order, or regulatory requirement to perform the cleanup. . . . [T]he Kane [s]uit reveals that the exception [would] appl[y] to the removal and replacement of the defective roofing material[, coverage Hussey has conceded under other provisions of the CGL, because the Insured] would be liable [for the conceded claims] . . . even in the absence of a mandated cleanup.
>
> The costs and expenses arising out of the treatment and remediation of the [P]ond, however, constitutes damages incurred as a result of a request/demand by the Illinois [EPA] to bring the pond within the standards set forth by the [state's environmental laws]. These costs and expenses . . . are not excepted from the scope of the pollution exclusion.

Federal's Reply Br. in Supp. of Summ. J. (Doc. 30, hereafter cited as same) at 6-7.

Not long before the parties' briefing closed, the intermediate appellate court of Massachusetts was called upon to interpret the same language in question here. *See* Clean Harbors Envtl. Servs., Inc. v. Boston Basement Techs., Inc., 2008 Mass. App. Div. 72, 2008 WL

---

This 'guessing game' determination of coverage leaves a policyholder in limbo, without any genuine promise of coverage.

[Consequently, even the modified pollution exclusion] provides very little pollution coverage, particularly in the area of cleanup or remediation . . . . A policyholder with any significant pollution risk, even in the area of an exception to the exclusion, such as products and completed operations, does not have adequate coverage under the [CGL]. Risk managers, brokers, and agents would do well to either extensively amend the CGL or obtain separate pollution coverage for any of their policyholders who have more than minimal or incidental pollution exposures.

*Stanovich* article at 8 (emphasis added).

534536 (Mass. App. Ct. Feb. 26, 2008). In Clean Harbors, an environmental cleanup company was retained by a basement waterproofer to remediate a leak originating from its client's oil line. *See id.* at *1. The remediation was ordered by the Commonwealth's Department of Environmental Protection, which issued a notice of responsibility letter to the waterproofer. *Id.* The remediation was completed and, when the waterproofer failed to pay, the cleanup company sued. *Id.* The waterproofer joined its insurer as a third-party defendant based on its refusal to defend or indemnify, and the court was called upon to interpret the modifying language.

Somewhat consistent with Federal's position here, the insurer agreed the exception allowed for coverage of the damage to the client's property; thus it offered to defend the insured against the client's property damage claims. *See id.* at *2. The insurer argued, though, that the costs of environmental remediation were excluded, and the trial and appellate courts agreed:

> The exception to the pollution exclusion in this case is unambiguous. Construed in its usual and ordinary sense, the language . . . preserved coverage of [the insured's] property damage liability incurred <u>before its obligation to clean up pollution as well as its liability for property damage incurred as a result of the pollution, but not as part of the cleanup</u>.
>
> This interpretation is reasonable in the context of the entire insurance contract. . . . An integrated reading of the coverage provision, exclusion, and exception discloses an intent to exclude entirely the costs [of remediation], but to retain coverage for property damage liability caused by [the] pollution.

*Id.* at *3 (numerous citations omitted) (emphasis added). The Clean Harbors Court therefore held that the insured's cleanup costs did not fall within the exception to the pollution exclusion, and there was no duty to defend or indemnify. *See id.* at *4.

The undersigned agrees with the above analyses, and respectfully recommends that they be adopted here. Setting aside Hussey's citation to a secondary source written by an individual who has made his living protecting the interests of policyholders, the Insured has identified no legal authority supporting a broader reading. Federal likewise has little room to disagree, given its position here that the PBC's damaged roof would be covered in the absence of non-pollution related exclusion(s). *See* discussion *supra*. For these reasons, the District Court should apply Clean Harbors.

Under that decision's reasoning, all of Hussey's claims relating to remediation/cleanup are barred by Royal's modified pollution exclusion. This includes the majority of relief sought in Kane, and all of the potential liability in Peoples. *See* discussions *supra* (Kane suit involves environmental remediation, and Peoples is restricted to such relief alone).

Other aspects of the Kane plaintiff's damages, however, are akin to the client-property owner's claims in Clean Harbors, namely the PBC's assertions "the Pond has been damaged," "the use of the Pond has been impaired," streams "both on and off [its] property" were adversely affected, and "fish kills" resulted.

Although many of the plaintiff's harms will likely be addressed through remediation, this court cannot say with certainty that Hussey has not incurred "property damage liability . . . before [the] obligation to clean up pollution" or "property damage incurred as a result of the pollution." *See* discussion *supra*. Rather, the PBC has alleged pre-remediation impairment in its use of the Pond, as well as injuries that may not be remedied by the cleanup (*e.g.*, the fish kills).

Whether the PBC will meaningfully pursue or succeed in its loss of use and related property claims remains unclear. Pennsylvania law makes plain, however, that the duty to defend

exists when the underlying claims "may potentially come within the coverage of the policy." Heffernan & Co. v. Hartford Ins. Co. of Amer., 614 A.2d 295, 298 (Pa. Super. 1992) (citations omitted, emphasis added). This obligation continues "until such time . . . it is determined that the claim[s are] confined to a recovery . . . the policy does not cover." Bombar v. West Amer. Ins. Co., 932 A.2d 78, 87 (Pa. Super. 2007). There is no indication, based on the current record, that such a time has come to pass, and Federal has failed to prove an absence of coverage.

The undersigned is cognizant that Coal Heat and other courts have extended the absolute pollution exclusion to claims for "diminution in property value[]." *See* discussion *supra*. Critically, though, none of the Pennsylvania precedent has faced the modifying language presented in Federal's later policies.[5]

In the end, it remains the insurer's burden to prove the applicability of a liability exclusion, *see* Coal Heat, 2002 WL 1689713 at *6, and Federal has failed to carry its burden. Accordingly, summary judgment should be granted in favor of Hussey and against Federal to the extent described above.

### D. Hussey Has Failed to Establish Custom and Usage.

In reliance on Sunbeam Corporation v. Liberty Mutual Insurance Company, Hussey argues the Insurers' pollution exclusions are informed by "trade usage in the insurance industry" establishing that injuries resulting from "products and completed operations" remain covered.

---

[5] Federal's duty to defend flows from, and should be limited to, the policies containing the modified language (*i.e.*, those from August 2002 until August 2004). Although Hussey suggests the additional language constitutes a "[c]larification" that should be read into the prior policies, *see* Doc. 25 at 13, counsel has failed to identify legal authority or policy language supporting its interpretation. The terms of the policies were different, and they lead to different results.

*See* Doc. 25 at 16-19 (citing *id.*, 781 A.2d 1189 (Pa. 2001)). This is not the case.

In *Sunbeam*, the Pennsylvania Supreme Court found the insured could survive the state-court equivalent to Federal Rule 12(b)(6) under a theory that the terms "sudden and accidental" had a "special meaning or usage" in the insurance industry equivalent to prior CGL language, "unexpected and unintended." *See id.* at 1193-95 (citations omitted).

Here, the Insured seeks not to challenge concrete policy language based on industry usage of specified terms, but rather challenges broad principles regarding the scope of so-called "absolute" pollution exclusions. The word "absolute" appears nowhere in the Insurers' policy exclusions, and Hussey otherwise has failed to identify specific words or phrases in the exclusion to which it can tether a custom and usage argument. The Insured reads *Sunbeam* too broadly, and its arguments are unpersuasive.[6]

### E. Hussey Is Entitled to Discovery Regarding Its Regulatory Estoppel Theory.

The *Sunbeam* Court also endorsed the theory of regulatory estoppel:

> [A]ccording to principles of regulatory estoppel, . . . . [the insureds] alleged that . . . the insurance industry, including the defendant insurers, submitted to the Pennsylvania insurance department a memorandum . . . assert[ing] that the disputed language . . . would not result in any significant decrease in coverage. The [insureds] alleged, moreover, that the insurance department relied on the industry's representation[s] when it approved the disputed language for inclusion in standard [CGL] policies without a reduction in premiums to balance a reduction in coverage.

---

[6] As a practical matter, accepting Hussey's custom and usage theory would require the District Court to turn its back on the oft-litigated and firmly established Pennsylvania law regarding the breadth and enforceability of the absolute pollution exclusion. Affixing specialized meaning to its terms would call this entire area of the law into question, and the undersigned does not believe the *Sunbeam* Court meant to invite such dramatic and indiscriminate sea changes in the law, at least under the rubric of custom and usage. *Cf.* discussion immediately *infra* regarding *Sunbeam's* broad reading of regulatory estoppel doctrine.

> [Should the insureds succeed on this theory, the insurers], having represented to . . . a regulatory agency . . . that the new language . . . did not involve a significant decrease in coverage from the prior language, . . . [would] not be heard to assert the opposite position when claims [were] made by . . . policyholders.

*Id.* at 1192-93; *see also id.* at 1193 (reversing trial court's dismissal of coverage claims in light of regulatory estoppel argument).

In this case, Hussey has submitted articles indicating that analogous assurances were made to state insurance regulators, including ones to the Pennsylvania Insurance Department ("the PID"). *See, e.g,* J.A. MacDonald, *Decades of Deceit: The Insurance Industry Incursion into the Regulatory and Judicial Systems*, 7 Coverage 9 (Nov., Dec. 1997) ("the *MacDonald* article") ("In a March 11, 1985 letter to the Commonwealth . . ., [the Insurance Services Office, or] ISO . . . reaffirmed that coverage is not excluded under the 'absolute' pollution exclusion for 'products' and 'completed operations' claims.") (citing letter). The Insured concedes it has yet to obtain admissible evidence in this regard, but its counsel requests discovery under Federal Rule 56(f) to further develop the record. *See* Aff. of Hussey's counsel (Doc. 26) at ¶ 9 (requesting investigation into "representations [made] to the [PID]").

The Insurers object to Hussey's Rule 56(f) request, arguing that it rests on speculation and should have been raised earlier. *See* Doc. 30 at 14-15; Royal's Reply Br. in Supp. of Summ. J. (Doc. 27) at 22-23. The undersigned submits, however, that any speculation is the result of the Insured's lack of discovery, and its failure to raise the issue sooner is excused by the unusual procedural posture resulting from counsels' case management strategy. *See* discussion *supra* (noting that Insurers proposed litigating pollution exclusions before full discovery was taken).

Although Hussey arguably could have raised the estoppel issue sooner, the District Court should find a complete rejection of the theory too harsh a result.

That being said, the undersigned believes and therefore recommends that discovery should be limited to representations made to the PID. This is all the Insured has requested,[7] and the cases endorsing regulatory estoppel have focused on representations made to the state under which the policy is interpreted. *See, e.g.*, Sunbeam, 781 A.2d at 1192 *and* Simon Wrecking Co., Inc. v. AIU Ins. Co., -- F. Supp.2d --, 2008 WL 638175, *2 (E.D. Pa. Mar. 10, 2008) (looking to representations made to Pennsylvania regulators in applying Commonwealth's insurance law). Such a limitation also is consistent with the courts' recognition that matters of insurance regulation are entrusted to the individual states. *See generally* Amica Mut. Ins. Co. v. Bourgault, 979 F.2d 187, 190 (11th Cir. 1992) (noting "[the] prevailing system in which each state may adopt individual insurance regulations"); Rohr v. Allstate Ins. Co., 2007 WL 3120131, *3 (5th Cir. Oct. 25, 2007) ("Congress has allowed fifty states to have their own uniform system of insurance regulations, indicating that [they] have a strong interest in applying their [own] insurance laws") (citation omitted).[8]

---

[7] *See* Rule 56(f) Affidavit, cited *supra*; *see also* Doc. 25 at 21 (requesting discovery regarding "representations to the [PID] on the applicability of the pollution exclusion to products cases").

[8] Restricting the inquiry to Pennsylvania also serves to limit concerns regarding untamed "fishing expeditions" on the part of insureds. More generally, the undersigned is troubled by the potential widespread implications of *Sunbeam's* generous endorsement of regulatory estoppel. It is not hard to imagine this position being asserted in any coverage dispute where the terms at issue have been vigorously contested and/or the subject of years of development and modification. Nevertheless, *Sunbeam* is binding in this diversity action, and the District Court is constrained to follow it.

Finally, Royal takes great pains to show that the articles cited by Hussey nevertheless support an exclusion of coverage. Given that the relevant question is what the Insurers (or the organization(s) that drafted its policy language) represented to the PID, there is little reason to quibble over the advocacy pieces attached to the Insured's summary judgment papers.[9]

As to the merits of Royal's arguments, they are much better addressed once the court and parties determine what, if anything, was represented to the PID. The Insurers construe the underlying actions as presenting "traditional environmental pollution" claims, *see, e.g.*, Doc. 30 at 11, and this may be true under Pennsylvania law regarding unmodified, absolute pollution exclusions. The regulatory estoppel inquiry is different, however, as it focuses on the insurance industry's purported representations to state regulators.

---

[9] While the Insured's articles differ somewhat in tone, portions of them consist of pure advocacy on behalf of policyholder interests. The *MacDonald* article is particularly unrestrained, and the author's discussion of a Third Circuit decision at best gilds the lily and at worst misrepresents its holding. *See id.* at 3 (accusing courts of being "unable or unwilling to give . . . policy holders recourse because of . . . contract interpretation [principles]"); *compare also id.* at 11 (suggesting Reliance Ins. Co. v. Moessner, 121 F.3d 895 (3d Cir. 1997) rejected absolute pollution exclusion based on "products liability and completed operations" exception) *with* Moessner at 901-902 (rejecting, among other things, argument that exclusion was limited to "claims in the nature of an environmental catastrophe," but ultimately finding coverage through unrelated doctrine of "reasonable expectations," one advanced neither by Mr. MacDonald or Hussey here). Another view may be that, given the frequent and highly visible litigation regarding pollution exclusions, a policyholder or its agent(s) would need to have their heads in the sand to only first consider the issue upon facing a potential coverage claim. *Compare Stanovich* article quoted *supra* ("[a] policyholder with any significant pollution risk . . . does not have adequate coverage under the [CGL]," and "[r]isk managers, brokers, and agents would do well to either extensively amend the CGL or obtain separate pollution coverage for any . . . policyholder[] who ha[s] more than minimal or incidental pollution exposures") *with* discussion *supra* (noting Hussey's roofing material was purposefully coated with lead).

Presuming the Insurers, their drafters, or representative organizations[10] did assert that "products" and "completed operations" remained covered, the inquiry takes on greater complexities. This is so because the case law and secondary sources present a <u>spectrum</u> of claims potentially falling under the absolute pollution exclusion.

At one end are "product" claims, in their purest (and arguably most tangential) form. A commonly cited example is the hypothetical case where a bottle of clorox spills in a grocery store and a child slips in it, falls, and is injured. *See MacDonald* article at 10. Even the most cynical insurer would likely have some trepidation in denying coverage under the circumstances.

At the other end of the spectrum are claims involving Superfund-type hazardous waste emissions. *See id.* at 11. Few policyholders would disagree that the pollution exclusion would apply.

A myriad of permutations lie between, including the underlying claims here. On one hand, Hussey's lead and copper runoff undoubtedly came from a finished "product," which left its hands and was installed by others on a third party's premises. On the other hand, the deterioration of its roofing material indisputably caused environmental contamination resulting in a governmentally ordered remediation.

Once the facts come in, counsel may raise anew their arguments for and against coverage given the regulatory estoppel doctrine. At that time, the parties and court will have greater context within which to conduct their analyses.

---

[10] *See, e.g.,* <u>Chemical Leaman Tank Lines, Inc. v. Aetna Cas. & Sur. Co.</u>, 89 F.3d 976, 992 (3d Cir. 1996) (rejecting argument that insurers who did not communicate directly with state agency remained unbound by regulatory estoppel, as "they benefitted from the misleading explanation [regarding] the effect of the standard pollution exclusion submitted . . . by insurance industry trade groups").

For these reasons, the District Court should grant the Insurers' Motions for Summary Judgment regarding the unmodified, absolute pollution exclusion, subject to a recognition that the denial of coverage may be barred by regulatory estoppel.[11]

**CONCLUSION**

For all of the reasons stated above, the parties' cross-Motions for Summary Judgment should be granted in part, denied in part, and denied without prejudice regarding the issue of regulatory estoppel. Hussey's Motion for Leave to Amend should be denied as futile, given its inability to state viable "personal injury" claims under Royal's policies. Finally, the parties should be ordered to participate in a telephone conference with the undersigned to discuss the Insured's taking of limited, expedited discovery regarding the issue of regulatory estoppel.

In accordance with the Magistrate's Act, 28 U.S.C. § 636 (b)(1)(B) and (C), and Rule 72.1.4 (B) of the Local Rules for Magistrates, objections to this Report and Recommendation are due by May 22, 2008. Responses to objections are due by June 2, 2008.

May 6, 2008

Francis X. Caiazza
U.S. Magistrate Judge

cc (via email):

David E. White, Esq.
William M. Wycoff, Esq.
Ralph J. Luongo, Esq.
William P. Shelley, Esq.

---

[11] Hussey has presented no justification for taking discovery regarding Federal's modified pollution exclusion. There is no evidence the insurance industry made representations to the PID regarding the new language and, to the extent it did, Hussey has waived any arguments in this regard.

-19-